William L. PASOS, Plaintiff-Appellant,

v.

PAN AMERICAN AIRWAYS, Inc.,
Defendant-Appellee.

No. 121, Docket 23479.

United States Court of Appeals
Second Circuit.

Argued Dec. 6, 1955.
Decided Jan. 23, 1956.

Nicholas R. Doman, New York City, for appellant.

Dewey, Ballantine, Bushby, Palmer & Wood, New York City (John E. F. Wood and Richard A. Zuniga, New York City, of counsel), for appellee.

Before SWAN, FRANK and LUMBARD, Circuit Judges.

FRANK, Circuit Judge.

1. This is a suit, with federal jurisdiction based on diversity of citizenship, to recover damages for defendant's alleged trespass upon, and unlawful use and occupation of, land in Nicaragua. At common law, such a "local" action could not be maintained in any jurisdiction except that in which the land was located; see Ellenwood v. Mariette Chair Co., 158 U.S. 105, 107, 15 S.Ct. 771, 39 L.Ed. 913. In Livingston v. Jefferson, 1811, 15 Fed.Cas. page 660, No. 8,411, Marshall, sitting at the Circuit, held that, as a consequence, a federal court had no jurisdiction of such a suit, since Section 11 of the Judicial Code of 1789, 1 Stat. 78, defined the subject matter of the jurisdiction in diversity cases as "suits of a civil nature at common law or in equity." In the revision of 1948, Section 1332 of 28 U.S.C. changed this language to "all civil actions." But the Reviser's Note shows that Congress did not intend, by this verbal change, to enlarge federal jurisdiction. In Ellenwood v. Marietta Chair Co., 158 U.S. 105, 108, 15 S.Ct. 771, 39 L.Ed. 913, and Huntington v. Attril, 146 U.S. 657, 669, 13 S.Ct. 224, 36 L.Ed. 1123, there are statements perhaps indicating a rejection of Livingston v. Jeffer-

son, supra; but we think that those statements were dicta.

Plaintiff argues that the situation here is different because a New York statute, Real Property Law, McK.Consol.Laws, c. 50, § 536, enacted in 1913, allows such a suit to be maintained in New York. In Jacobus v. Colgate, 217 N.Y. 235, 111 N. E. 837, 840, the court said that, by this statute, "The foreign has not been transformed into a domestic tort." But the court also said that this legislation, in granting a remedy in New York where none had been available previously, "is equivalent, in substance, to the creation of a cause of action." If Jacobus means that the statute merely extended the jurisdiction of the New York courts, and if Marshall's ruling still stands, it is most doubtful whether the district court had jurisdiction. For, in Livingston v. Jefferson, Marshall held that a statute of Virginia, if construed to authorize a suit for trespass to land outside Virginia, could not enlarge federal jurisdiction. But cf. Angel v. Bullington, 1947, 330 U. S. 183, 67 S.Ct. 657, 91 L.Ed. 832.

If Jacobus means that New York created a new "remedial right" of a sort not previously enforced by federal courts, then the question arises whether a federal court will give effect to such a right. The answer seems to be no, if Pusey & Jones v. Hanssen, 1923, 261 U.S. 491, 43 S.Ct. 454, 67 L.Ed. 763, still has vitality, despite Erie R. Co. v. Tompkins, 1938, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188.

The discussion in Guaranty Trust Co. v. York, 1945, 326 U.S. 99, 106, footnote 3, 65 S.Ct. 1464, 89 L.Ed. 2079, seems to show that the doctrine of Pusey & Jones survived the Erie holocaust. However, our decision (against the dissent of the writer of this opinion) in Franke v. Wiltschek, 2 Cir., 209 F.2d 493, may perhaps be read as holding that Erie v. Tompkin destroyed Pusey & Jones, although Brandeis, J., wrote the opinions in both Pusey & Jones, 1923, and Erie, 1938.[1] See 2 Moore, Federal Practice (2d ed. 1948) 448–455.

If Jacobus means that New York created a new substantive right (which seems doubtful), perhaps the district court had jurisdiction of the instant suit. For it cannot be invariably true that a federal court, in a diversity case, lacks jurisdiction of an action based on a state statute which creates a substantive right unknown at common law, else no federal court could entertain a diversity suit based on a state wrongful-death statute.

The Marshall doctrine works a severe hardship on a plaintiff if he cannot get service on the defendant in the foreign jurisdiction.[2] For that reason, it may be that the Supreme Court will discard that doctrine. But we may not do so.

After considering the foregoing, we hold, although with much doubt, that this suit should be dismissed for want of jurisdiction in the district court. However, as this ruling may be overruled by the Supreme Court, we think it desirable to discuss the merits.

■■■ 2. If the district court had jurisdiction, then it correctly dismissed the complaint on the merits. For that court found—in findings which are supported by the evidence and thus not "clearly erroneous"—that to decide the case for plaintiff, the court would have to hold invalid several domestic acts of the government of Nicaragua. This may not be done. See, e. g., Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456; Banco de Espana v. Federal Reserve Bank, 2 Cir., 114 F.2d 438, 443–444, and cases there cited and discussed.[3] We reject plaintiff's contention that this doc-

---

1. See also Kelleam v. Maryland Casualty Co., 1941, 312 U.S. 377, 61 S.Ct. 595, 85 L.Ed. 899.

2. That is not the fact in the instant case.

3. The acts of the Nicaraguan Government, as found by the court below, were as follows: (1) In 1927, the Government of Nicaragua turned over certain land, including that claimed by the plaintiff, to the United States Marines, giving them "complete occupancy and control of the property and complete power to use it, and permit others to use it, for any purpose." The defendant, in 1928, secured permission from the United States

trine applies solely to "physical" acts of a foreign government. Moreover, the evidence shows that a decision for plaintiff would necessitate holding invalid several "physical" acts by the government of Nicaragua.

We remand with directions to dismiss for lack of federal jurisdiction.

See also D.C., 136 F.Supp. 157.

Marine Corps to use the air field built on this land for its commercial operations. (2) In 1932, just before the Marines left Nicaragua, the Government instituted condemnation proceedings to acquire the land which was occupied by the Marine Corps. In 1933, after the departure of the Marines, the Government of Nicaragua assumed complete control and occupation of the air field. (3) In 1932 and 1934, defendant entered into contracts with the Nicaraguan Government providing for the use of the air field by defendant. (4) In 1932, the President of Nicaragua issued a decree prohibiting the erection of any building within a radius of 500 meters of any air field without government approval. Any building which was permitted within this radius could not be more than 30 feet high.