Raphael **BIGIO, Bahia Bigio, Ferial Salma Bigio and B. Bigio & Co.,** Plaintiffs–Appellants,

v.

The **COCA–COLA COMPANY and The Coca–Cola Export Company,** Defendants–Appellees.

Docket No. 98–9058.

United States Court of Appeals, Second Circuit.

Argued Nov. 1, 1999.

Decided Dec. 7, 2000.

Amended Jan. 2, 2001.

Nathan Lewin, Miller, Cassidy, Larroca & Lewin, L.L.P., Washington, DC (Grant R. Vinik, Miller, Cassidy, Larroca & Lewin, L.L.P., of counsel; Edward L. Sadowsky and Andrew M. Zeitlin, Tenzer, Greenblatt, L.L.P., New York, NY, of counsel), for Plaintiffs–Appellants.

William M. Dreyer, The Coca–Cola Company, Atlanta, GA (Laurence V. Senn, Jr., and Richard F. Hans, King & Spalding, New York, NY, of counsel), for Defendants–Appellees.

Heather J. Friedman, New Haven, CT, submitted a brief for Amicus Curiae Allard K. Lowenstein International Human Rights Law Clinic.

Robert L. Weinberg, Washington, DC, submitted a brief for Amicus Curiae International Association of Jewish Lawyers and Jurists, American Section.

Before McLAUGHLIN, JACOBS, and SACK, Circuit Judges.

**AMENDED OPINION**

SACK, Circuit Judge:

This case arises out of a seizure and confiscation of foreign property allegedly in violation of New York State and international law. The plaintiffs, Raphael Bigio, Bahia Bigio, Ferial Salma Bigio and B. Bigio & Co. (collectively, "the Bigios") seek damages from the defendants, The Coca–Cola Company and The Coca–Cola Export Corporation (collectively, "Coca–Cola"), for their conduct in connection with the nationalization of the Bigios' property by the Egyptian government in the early 1960's. The plaintiffs' complaint invokes jurisdiction under the Alien Tort Claims Act, 28 U.S.C. § 1350,[1] and diversity of citizenship under 28 U.S.C. § 1332. The defendants moved for an order dismissing the complaint on several grounds, including lack of subject matter jurisdiction. The United States District Court for the Southern District of New York (John S. Martin, *Judge* ) granted the defendants' motion, concluding that the plaintiffs had not satisfied the prerequisites for jurisdiction under the Alien Tort Claims Act, and that the act of state doctrine barred the court's exercise of jurisdiction despite the parties' diversity of citizenship. *See Bigio v. Coca–Cola Co.*, No. 97 Civ. 2858(JSM), 1998 WL 293990, 1998 U.S. Dist. LEXIS 8295 (S.D.N.Y. June 5, 1998).

Addressing jurisdictional questions first, we hold that the district court does have jurisdiction over this action. We agree with the district court that jurisdiction does not lie under the Alien Tort Claims Act, but hold that the court has jurisdiction by reason of the diversity of citizenship of the parties under 28 U.S.C. § 1332. We assume that the "local action doctrine" is jurisdictional, but conclude that it does not prevent the district court from exercising jurisdiction in this case.

---

1. We have also referred to this statute as the "Alien Tort Statute," *see, e.g., Wight v. Bankamerica Corp.*, 219 F.3d 79, 91 (2d Cir.2000) (internal quotation marks and citation omit-ted), and the "Alien Tort Act," *see, e.g., Jota v. Texaco, Inc.*, 157 F.3d 153, 156 (2d Cir.1998), the form used by the district court.

Two types of abstention, the act of state doctrine and principles of international comity, could be applicable to this case nonetheless and, if so, may counsel against the district court's exercise of jurisdiction. We hold, contrary to the conclusion of the district court, that the act of state doctrine does not apply. Because the district court relied in part on the act of state doctrine in dismissing this action, it did not decide whether principles of international comity permit the case to be heard. We remand for the court to make that determination.

Finally, we decline to address in the first instance the remaining issues argued by the parties on appeal, including whether this case should have been dismissed for failure of the plaintiff to join two indispensable parties, failure timely to file, failure to state a claim upon which relief can be granted, or failure to produce adequate evidence to survive a motion for summary judgment. We leave it to the district court to decide those issues if necessary.

## BACKGROUND

Plaintiffs Raphael Bigio and Ferial Salma Bigio are brother and sister, and plaintiff Bahia Bigio is their mother. All three are citizens and residents of Canada. Plaintiff B. Bigio & Co. is owned by the Bigio family and organized under the laws of Egypt. Defendants the Coca–Cola Company and the Coca–Cola Export Company are incorporated in the State of Delaware. The Coca–Cola Export Company is a wholly owned subsidiary of the Coca–Cola Company.

The property that is the subject of this action consists of land and factories located in Heliopolis, Egypt. The first factory on the Heliopolis land, which was then owned by the Bigio family, was built by the Bigios in 1932. Between 1938 and the Egyptian government's confiscation of the Bigios' property in the 1960's, Coca–Cola did business with the Bigios, buying various goods

from their factory. During the 1930's and 1940's, Coca–Cola was a tenant on the Bigios' land. In 1959, only a few years before the Bigios' property was seized, Coca–Cola entered into a written licensing agreement with the Bigios permitting them to manufacture Coca–Cola bottle caps for sale to Coca–Cola and its authorized bottlers.

According to the complaint in this action, the Bigios' property was seized by the Egyptian government in 1962. The Bigios contend that the Egyptian government, then led by President Gamal Abdel–Nasser, sequestered and nationalized their property because they were Jewish. The defendants have not disputed this contention on appeal. Deprived of their property, the Bigio family left Egypt in 1965.[2]

The complaint alleges that in or after 1993, Coca–Cola either purchased or leased the plaintiffs' property with full knowledge of the unlawful manner in which it had been seized from the plaintiffs. This assertion forms the sole basis for the plaintiffs' claims against Coca–Cola.

Material submitted by the plaintiffs to the district court provides additional background for an understanding of the plaintiffs' claims. According to this material, once the plaintiffs' property was seized by the Egyptian government, ownership of the property was transferred to the Misr Insurance Company ("Misr"), a company wholly owned by the Egyptian government. Misr in turn leased the property to the El–Nasr Bottling Company ("ENBC"), another company wholly owned by the Egyptian government, which operated the manufacturing plants.

In 1970, while ENBC was leasing the Bigios' former property from Misr, President Nasser died. In 1977, the Egyptian government apparently issued an edict re-

**2.** The plaintiffs maintain that they left Egypt as stateless refugees, having been deprived of their Egyptian citizenship by a 1956 amendment to the Egyptian Nationality Law. The defendants argue that the Bigios were

stripped of their Egyptian citizenship only after they left Egypt. The dispute over the plaintiffs' loss of citizenship need not be addressed for us to resolve this appeal and we therefore do not decide it.

voking the contracts of sale that had effected the transfer of the Bigios' property to Misr.[3] In 1979, purportedly pursuant to this edict, the Egyptian Ministry of Finance issued Decision Number 335, which ordered Misr to return the Bigios' property, along with any rental burden and active occupants, or to forward to the Bigios the proceeds of any sale of the property that might have occurred. On February 7, 1980, the Ministry of Finance sent a letter to Misr urging it to follow the instructions contained in Decision Number 335. That letter states:

> [T]he real estate properties owned by [the Bigios] and which were sold through Sequestration must now be physically returned to [the Bigios] unless the Company has already disposed of the assets through sale to a third party in the private sector. In such a case, the amount representing the price of sale must be reimbursed to [the Bigios]. . . .

Misr did not honor these instructions.

In 1993, the Egyptian government offered ENBC for sale. As of 1993, ENBC consisted of thirteen bottling plants and a number of distribution and warehousing facilities throughout Egypt. One of the bottling plants was located on the Bigios' former property.

Coca–Cola submitted a bid to purchase the shares of ENBC through its wholly owned subsidiary Atlantic Industries. A rival bid was submitted by MAC Investments S.A.E. ("MAC"), an Egyptian company unrelated to Coca–Cola. MAC previously had been in the business of bottling soft-drink products in competition with Coca–Cola in the Middle East. The Egyptian government accepted MAC's bid.

Though MAC won the bidding, it and Atlantic Industries thereafter reached an agreement to purchase the shares of ENBC jointly. Made with the knowledge and consent of the Egyptian government, the agreement was memorialized in a Share Sale and Purchase Agreement effec-tive April 20, 1994. Pursuant to that agreement, MAC, together with a company named MAC Beverages, purchased 58% of ENBC's shares. Atlantic Industries, together with another Coca–Cola subsidiary, the Soft Drink Services Company, purchased the remaining 42% of ENBC's shares. The Share Sale and Purchase Agreement provided that following the acquisition, 30% of ENBC's total shares would be resold to the Egyptian public and 10% of ENBC's total shares would be resold to ENBC's Employee Shareholders' Association. These transfers were made entirely from the shares owned by Atlantic Industries and Soft Drink Services Company, leaving the latter without any ownership interest in ENBC and Atlantic Industries with what is now just 3.5% of the shares of ENBC.

Although the Bigios have brought legal action against Misr in Egypt for, *inter alia,* its alleged failure to heed the Egyptian government's instruction to return to them the property or its "price of sale," they have not yet obtained resolution of their claims and Misr has not honored the decades-old instructions of the Ministry of Finance. The Bigios were also unsuccessful in their legal attempts to halt the privatization of ENBC.

Neither the defendants nor any of their subsidiaries have been named as parties in any of the Egyptian actions, but Raphael Bigio did contact Coca–Cola prior to the privatization in order to inform it of the Bigios' claims regarding the Heliopolis property. He advised Coca–Cola by letter dated February 4, 1994: "The purpose of having started the . . . litigation in Egypt is not in fact to prevent the sale of [ENBC] but to insure that . . . . the ultimate owners of these assets and factories [i.e., the Bigios] receive a just and fair compensation share in this acquisition." Coca–Cola's investigation prior to the acquisition led it to conclude that ENBC had no liability to the Bigios, and accordingly it

---

**3.** The edict is referred to in the February 7, 1980 letter from the Ministry of Finance to Misr discussed below, but does not appear to be part of the record on appeal.

executed the agreement to purchase stock in ENBC as planned.

The plaintiffs filed this lawsuit in the United States District Court for the Southern District of New York on April 21, 1997, seeking compensatory and punitive damages for the defendants' allegedly improper conduct in "converting plaintiffs' assets" and joining in a "violation of universally accepted norms . . . of human rights." Their complaint alleged that Coca–Cola engaged in wrongdoing by "acquiring the assets of ENBC, knowing that plaintiffs had been deprived of their rights to the property solely because of their religious faith."[4] The complaint asserted that the district court possessed subject matter jurisdiction over their claims pursuant to the Alien Tort Claims Act, 28 U.S.C. § 1350, and the diversity of citizenship statute, 28 U.S.C. § 1332.

On August 26, 1997, the defendants moved for an order dismissing the complaint under Fed.R.Civ.P. 12(b)(1), 12(b)(3) and 12(b)(6), or awarding the defendants summary judgment pursuant to Fed. R.Civ.P. 56. The defendants argued that the court lacked subject matter jurisdiction under the Alien Tort Claims Act, that diversity jurisdiction was barred by the local action doctrine, and that the district court should in any event abstain from hearing the case pursuant to principles of international comity as well as the act of state, local action and *forum non conveniens* doctrines. They also argued that the plaintiffs failed to state a claim upon which relief can be granted, failed to join two indispensable parties, the Arab Republic of Egypt and Misr, and failed to file suit within the time required by the statute of limitations. The defendants filed with their motion a sworn declaration by an Egyptian lawyer, Ahmed G. Abou Ali, contradicting the allegations contained in the complaint. The defendants suggested in their brief in support of the motion that the district court should treat the motion

to dismiss for failure to state a claim as a motion for summary judgment to the extent that the court relied on the Ali declaration.

The plaintiffs responded by filing a cross-motion for partial summary judgment pursuant to Fed.R.Civ.P. 56(a) and 56(d) on the issue of liability. The plaintiffs also opposed the defendants' motion and supported their own cross-motion with an affidavit by plaintiff Raphael Bigio and fifteen supporting exhibits.

The district court (John S. Martin, *Judge*) granted the defendants' motion and denied the plaintiffs' cross-motion on the grounds that subject matter jurisdiction is not provided for by the Alien Tort Claims Act, and is otherwise barred by the act of state doctrine. *See Bigio,* 1998 WL 293990, at *2–*3, 1998 U.S. Dist. LEXIS 8295, at *4–*11. With respect to the Alien Tort Claims Act, the district court held that: (1) "the wrong allegedly committed by" Coca–Cola was an ordinary tort and not a violation of international law; and (2) the complaint did not allege that the defendants acted "under color of law" or "in concert with" the Egyptian government when that government committed its violation of international law, if any, in the 1960's. *Id.,* 1998 WL 293990, at *2, 1998 U.S. Dist. LEXIS 8295, at *6, *9 (internal quotation marks omitted).

As for the act of state doctrine, the district court concluded that the doctrine applied in this case because "[i]n order to decide the case for plaintiffs, the Court would have to hold invalid the domestic acts of the Egyptian government—seizure and nationalization of plaintiffs' property pursuant to [the] Decrees . . . of 1961." *Id.,* 1998 WL 293990, at *3, 1998 U.S. Dist. LEXIS 8295, at *9–10. The district court acknowledged the plaintiffs' argument that the act of state doctrine should not apply because the Egyptian government had repudiated its confiscation of the plaintiffs'

---

4. The complaint alleged that Coca–Cola directly acquired the assets of ENBC, which

rightfully belonged to the plaintiff.

property by way of the letter from the Ministry of Finance to Misr dated February 7, 1980. The district court concluded, however: "[I]t is not clear what kind of legal effects this letter has under Egyptian law and plaintiffs have not provided any evidence regarding the legal effect of the letter. Clearly, this is a matter that should be decided by the courts of Egypt." *Id.*, 1998 WL 293990, at *3, 1998 U.S. Dist. LEXIS 8295, at *10.

The district court did not address any of the defendants' other arguments in favor of dismissal or summary judgment. It dismissed the complaint solely because it lacked jurisdiction under the Alien Tort Claims Act and the act of state doctrine.

This appeal followed. The defendants have renewed each of the arguments they presented to the district court except for that based on *forum non conveniens* principles.

## DISCUSSION

### I. Jurisdictional Issues

■ We review *de novo* the dismissal of a complaint for lack of subject matter jurisdiction. *See, e.g., Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir.1998). Although we agree with the district court that subject matter jurisdiction does not lie under the Alien Tort Claims Act, we reject the defendants' contention that under the "local action doctrine," the district court does not have diversity jurisdiction pursuant to 28 U.S.C. § 1332.

### A. Alien Tort Claims Act

■ The Alien Tort Claims Act, 28 U.S.C. § 1350, provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." The plaintiffs argue that "[i]f the [Egyptian] government seized the plaintiffs' property as part of a national program of religious persecution, the seizure violated the law of nations and therefore conferred federal jurisdiction under the [Alien Tort Claims Act]." The argument is misdirected. It does not matter for purposes of determining whether there is jurisdiction under the Alien Tort Claims Act whether the Egyptian government violated international law because there is no allegation that Coca–Cola was involved in the taking of the Bigios' property or complicit in the government's alleged violation of international law.

The complaint alleges that sometime after 1993, Coca–Cola purchased or leased the plaintiffs' property from ENBC with full knowledge that ENBC had acquired the property through unlawful confiscation on the basis of religion. The complaint contains no other allegation of wrongful conduct by Coca–Cola. We confine our discussion to the allegations in the complaint because if the complaint did not plead a violation of the law of nations by Coca–Cola, the district court was without subject matter jurisdiction under the Alien Tort Claims Act, and neither it nor we may consider the matter further under the Act. *See Kadic v. Karadzic*, 70 F.3d 232, 238 (2d Cir.1995), *cert. denied*, 518 U.S. 1005, 116 S.Ct. 2524, 135 L.Ed.2d 1048 (1996) ("[T]he Alien Tort Act requires that plaintiffs plead a 'violation of the law of nations' at the jurisdictional threshold . . . ." (quoting 28 U.S.C. § 1350)); *Filartiga v. Pena–Irala*, 630 F.2d 876, 887–88 (2d Cir.1980) (distinguishing Alien Tort Claims Act, with its jurisdictional pleading requirement, from general federal question jurisdiction, which is "not defeated by the possibility that the averments in the complaint may fail to state a cause of action" (citing *Bell v. Hood*, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946))).

The first issue we must address is whether Coca–Cola can have violated "the law of nations" if it acted solely as a nongovernmental entity.

This Court held in *Kadic* that certain forms of conduct by private individuals may violate the law of nations even where the individual in question does not act under color of law. *See Kadic*, 70 F.3d at

239. We took note of the Restatement (Third) of Foreign Relations Law of the United States (1986), which identifies "those violations that are actionable when committed by a state and a more limited category of violations of 'universal concern'. . . ." *Id.* at 240. And there are " 'a handful of crimes to which the law of nations attributes individual responsibility.' " *Id.* (quoting *Tel–Oren v. Libyan Arab Republic,* 726 F.2d 774, 795 (D.C.Cir. 1984) (Edwards, J., concurring), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985)). The relevant portion of the Restatement provides:

> A state has jurisdiction to define and prescribe punishment for certain offenses recognized by the community of nations as of universal concern, such as piracy, slave trade, attacks on or hijacking of aircraft, genocide, war crimes, and perhaps certain acts of terrorism, even where [no other basis of jurisdiction] is present.

Restatement (Third) of Foreign Relations Law of the United States § 404 (1986). We held in *Kadic* that war crimes and acts of genocide are actionable under the Alien Tort Claims Act without regard to state action, but that "torture and summary execution—when not perpetrated in the course of genocide or war crimes—are proscribed by international law only when committed by state officials or under color of law." 70 F.3d at 243.

▉ The complaint's sole allegation against Coca–Cola is that it acquired or leased property that previously had been expropriated on the basis of the owners' religion. However reprehensible, neither racial or religious discrimination in general nor the discriminatory expropriation of property in particular is listed as an act "of universal concern" in § 404 or is sufficiently similar to the listed acts for us to treat them as though they were incorporated into § 404 by analogy. Instead, these forms of conduct are included only in §§ 702 and 712 of the Restatement, which describe conduct that violates international law when undertaken by a *state* actor, which (as explained below) Coca–Cola was

not. *See* Restatement (Third) of Foreign Relations Law of the United States § 702 & cmts. j & m (racial and religious discrimination), § 712 (discriminatory taking of property).

▉ If a plaintiff does not allege conduct that supports private liability under international law, he or she must plead that the conduct was "committed by state officials or under color of law" in order for the court to exercise jurisdiction under the Alien Tort Claims Act. *Kadic,* 70 F.3d at 243. The question therefore is whether Coca–Cola was a state actor for these purposes. In *Kadic* we observed:

> The "color of law" jurisprudence of 42 U.S.C. § 1983 is a relevant guide to whether a defendant has engaged in official action for purposes of jurisdiction under the Alien Tort Act. A private individual acts under color of law within the meaning of section 1983 when he acts together with state officials or with significant state aid.

*Id.* at 245 (citation omitted). The complaint does not allege that Coca–Cola acted together with state officials. Neither was Coca–Cola charged with committing a violation of the law of nations with significant state aid. There is no allegation in the complaint that Coca–Cola's ability to purchase the property in question was enhanced by the transfer of the property from the Bigios to Misr—in other words, that its ability to purchase the property, or the price it paid, depended on the fact that the Egyptian government had expropriated the Bigios' property. A private party does not "act under color of law" simply by purchasing property from the government.

On appeal, the plaintiffs have attempted to expand their allegations against Coca–Cola by articulating claims not included in the complaint.

The plaintiffs allege, first, that Coca–Cola may have been a "participant" or "co-conspirator" in the Egyptian government's actions in the 1960's. The Plaintiffs argue that "Coca–Cola's precise role in the sei-

zure by the Egyptian government cannot be known prior to discovery." There is no allegation in the complaint, let alone any hint of evidence, however, that Coca–Cola had any role as a participant or co-conspirator in the confiscation of the Bigios' property.

■ The plaintiffs allege, second, that Coca–Cola may be held liable for any economic benefit it derived before 1994 from the seizure of the plaintiffs' property. The plaintiffs submit:

> If the plaintiffs are permitted to engage in discovery of Coca–Cola's records and to depose its officers and employees, they may establish that Coca–Cola benefitted from the sequestration and nationalization of its landlord's property. How did Coca–Cola's business and profits compare before the Bigio property was seized and after the seizure? Did the expropriation of the Bigios' property provide any economic benefit to Coca–Cola?

The causal chain between the Egyptian government's seizure and Coca–Cola's benefit is not articulated. An indirect economic benefit from unlawful state action is not sufficient to support jurisdiction over a private party under the Alien Tort Claims Act. Cf. *Ginsburg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 273 (2d Cir. 1999) ("Section 1983 [which, we have noted, is analogous to the Alien Tort Claims Act for these purposes] does not impose civil liability on persons who merely stand to benefit from an assertion of authority under color of law, but only on those who act under color of law."). Thus, even if this allegation were included in the complaint, the Alien Tort Claims Act would not provide for jurisdiction over this claim.

■ The plaintiffs allege, third, that Coca–Cola failed to prevent the Egyptian Government from seizing the Bigios' property in the 1960's. Yet the plaintiffs do not explain why Coca–Cola was under a legal obligation to intervene or how it possibly could have done so, and they point to no legal authority for the proposition that a private party may be liable under the Alien Tort Claims Act or § 1983, which is comparable for these purposes, for its failure to stop unlawful state action. Again, even if included in the complaint, this claim would not fall within the scope of the Alien Tort Claims Act.

We conclude that the plaintiffs' complaint failed to plead a violation of the law of nations by Coca–Cola. The district court therefore did not have subject matter jurisdiction over their claim under 28 U.S.C. § 1350.

### B. Diversity Jurisdiction

■ Although the district court lacked subject matter jurisdiction for torts covered by the Alien Tort Claims Act, it *did* possess subject matter jurisdiction over the plaintiffs' other claims pursuant to 28 U.S.C. § 1332. Section 1332 grants the federal district courts original jurisdiction over "all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, . . . between . . . citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Because the plaintiffs in this action are citizens of Canada and the defendants are Delaware corporations, *see* § 1332(c)(1), jurisdiction over this action is proper pursuant to the plain terms of § 1332(a).[5]

### C. Local Action Doctrine

■ The defendants urged the district court to dismiss this case under the "local action doctrine" for lack of subject matter jurisdiction, irrespective of the parties' diversity of citizenship and any of the other issues pertaining to this lawsuit. Under the local action doctrine, courts may not exercise jurisdiction over any "local" action involving real property unless the property at issue is found within the

---

**5.** There is no dispute and no reason to doubt that the amount-in-controversy requirement of § 1332 is satisfied in this case.

territorial boundaries of the state where the court is sitting. *See Ellenwood v. Marietta Chair Co.*, 158 U.S. 105, 107, 15 S.Ct. 771, 39 L.Ed. 913 (1895); *Hayes v. Gulf Oil Corp.*, 821 F.2d 285, 287 (5th Cir.1987). The district court did not rule on the defendants' request to dismiss on the basis of this principle. The defendants, describing the local action doctrine as "'ancient but still vibrant,'" urge us to conclude that the district court lacked diversity jurisdiction because of it. (Appellees' Brief at 37 n. 10 (quoting *Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, 1563 (D.C.Cir.1984) (Scalia, J., dissenting), *vacated*, 471 U.S. 1113, 105 S.Ct. 2353, 86 L.Ed.2d 255 (1985))).

The local action doctrine is a relic of English common law imported into this country by Justice Marshall while riding circuit in *Livingston v. Jefferson*, 15 Fed. Cas. 660 (C.C.D.Va.1811) (No. 8,411), and was last discussed by this Court in 1956, *see Pasos v. Pan American Airways, Inc.*, 229 F.2d 271, 272 (2d Cir.1956) (applying the doctrine "with much doubt"). It has been taken to require that "a suit, with federal jurisdiction based on diversity of citizenship, to recover damages for [a] defendant's alleged trespass upon, and unlawful use and occupation of, land in [a foreign country] ... not be maintained in any jurisdiction except that in which the land was located." *Id.*, 229 F.2d at 271.

The only two grounds for suit explicitly identified in the complaint were conversion and a violation of the law of nations cognizable in federal court pursuant to the Alien Tort Claims Act.

▮▮▮▮ Conversion is not an action for damages to real property. *See Garelick v. Carmel*, 141 A.D.2d 501, 502, 529 N.Y.S.2d 126, 128 (2d Dep't 1988); *Boll v. Town of Kinderhook*, 99 A.D.2d 898, 899, 472 N.Y.S.2d 496, 498 (1984); 23 N.Y. Jur.2d Conversion § 4 (1982). It is therefore not subject to the local action doctrine. The taking of property without just compensation because of the plaintiffs' religious faith that is alleged by the Bigios is no more limited by the local action doctrine than is

any other action which, though touching upon land, is brought on the basis of a legal theory other than trespass. Such actions may be heard in a jurisdiction other than that in which the property is located. *See Massie v. Watts*, 6 Cranch 148, 158–60, 3 L.Ed. 181 (1810); 15 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure* § 3822 (2d ed.1986). Thus, the only two causes of action explicitly identified in the complaint need not be brought in Egypt pursuant to the local action doctrine.

And the Bigios did not so much as mention the word "trespass" in their complaint. A claim for money damages based on trespass emerges from the complaint only upon application of the liberal rules governing notice pleading under the Federal Rules of Civil Procedure. *See generally Simonton v. Runyon*, 232 F.3d 33, 36–37 (2d Cir.2000) ("[G]enerally a complaint that gives full notice of the circumstances giving rise to the plaintiff's claim for relief need not also correctly plead the legal theory or theories ... supporting the claim." (quoting *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 712 n. 4 (2d Cir. 1980))).

Not only is the claim of trespass against Coca–Cola not explicit in the complaint, but any such claim would logically follow from and depend on the non-local claim at the heart of the Bigios' complaint, the allegedly unlawful taking and refusal to return their property and refusal to compensate them for the taking of the property, all because of their religion. We decline to declare the plaintiffs' entire suit "local" in character, and therefore beyond the jurisdiction of the district court, where the plaintiffs' non-"local" claims are predominant and the "local" claim is at most only implicit in the complaint. *See Raphael J. Musicus, Inc. v. Safeway Stores, Inc.*, 743 F.2d 503, 511 (7th Cir.1984) (refusing to dismiss entire action as "local" where request for damages for trespass was joined with requests for damages based on

breach of contract and fraud, and decision on trespass issue depended entirely on resolution of parties' respective contractual rights).

We therefore hold that the district court has jurisdiction over this case under 28 U.S.C. § 1332.

## II. Abstention Issues

■ Even when a district court has jurisdiction over a case, it may choose not to exercise that jurisdiction if principles of abstention are applicable. In this case, the district court's diversity jurisdiction may be subject to the application of the act of state doctrine and principles of comity. We conclude that contrary to the view of the district court, the act of state doctrine does not apply, and remand for the district court's application of the principles of international comity.

### A. Act of State Doctrine

Notwithstanding the diverse citizenship of the parties, the district court held that it lacked subject matter jurisdiction in this litigation because of the dictates of the act of state doctrine. *See Bigio*, 1998 WL 293990, at \*3, 1998 U.S. Dist. LEXIS 8295, at \*11. The United States Supreme Court's classic statement of this principle is more than 100 years old.

> Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory. Redress of grievances by reason of such acts must be obtained through the means open to be availed of by sovereign powers as between themselves.

*Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 42 L.Ed. 456 (1897); *see also Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964) ("The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory.").

■ In reviewing the district court's treatment of this issue, we note first that contrary to the conclusion of the court, the act of state doctrine "is not jurisdictional." *Allied Bank Int'l v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir.1985).[6] Jurisdictional or not, however, the district court held that in this case its application was required and that as a result the district court could not exercise its diversity jurisdiction.

> Although the standard of review of a district court's decision to abstain is often described as an abuse-of-discretion standard, we have noted that in the abstention area that standard of review is somewhat more rigorous. Because we are considering an exception to a court's normal duty to adjudicate a controversy properly before it, the district court's discretion must be exercised within the narrow and specific limits prescribed by the particular abstention doctrine involved.... Thus, ... there is little or no discretion to abstain in a case which

6. *Accord In re Papandreou*, 139 F.3d 247, 256 (D.C.Cir.1998); *Honduras Aircraft Registry, Ltd. v. Government of Honduras*, 129 F.3d 543, 549 (11th Cir.1997); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir.1992); *Lamb v. Phillip Morris, Inc.*, 915 F.2d 1024, 1026 (6th Cir.1990); *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1113 (5th Cir.1985); *Alberti v. Empresa Nicaraguense De La Carne*, 705 F.2d 250, 252 (7th Cir.1983). [The act of state doctrine] does not deprive the courts of jurisdiction once acquired over a case. It requires only that, when it is made to appear that the foreign government has acted in a given way on the subject-matter of the litigation, the details of such action or the merit of the result cannot be questioned but must be accepted by our courts as a rule for their decision. To accept a ruling authority and to decide accordingly is not a surrender or abandonment of jurisdiction but is an exercise of it. *Ricaud v. American Metal Co.*, 246 U.S. 304, 309, 38 S.Ct. 312, 62 L.Ed. 733 (1918). The act of state doctrine thus posed no obstacle to the assumption of jurisdiction on the basis of the parties' diversity of citizenship.

does not meet traditional abstention requirements.

*Hachamovitch v. DeBuono*, 159 F.3d 687, 693 (2d Cir.1998) (internal quotation marks and citations omitted; ellipses in original). Applying this standard of review, we reverse the district court on this point.[7]

The act of state doctrine, much the concern of scholars, *see, e.g., Sabbatino*, 376 U.S. at 424 n. 22, 84 S.Ct. 923, has not been explored extensively by the modern Supreme Court. There is, however, a substantial gloss on the doctrine that has been developed by our Court in light of the Supreme Court's teaching that: (i) its proper application requires a balancing of interests, *see W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Sabbatino*, 376 U.S. at 428, 84 S.Ct. 923; *see also Braka v. Bancomer, S.N.C.*, 762 F.2d 222, 224 (2d Cir.1985), and (ii) the act of state doctrine should not be invoked if the policies underlying the doctrine do not justify its application, *see Kirkpatrick*, 493 U.S. at 706, 110 S.Ct. 701; *Sabbatino*, 376 U.S. at 428, 84 S.Ct. 923; *Braka*, 762 F.2d at 224.

█ We begin with the proposition that the function of the court in applying the act of state doctrine is to "weigh in balance the foreign policy interests that favor or disfavor [its] application." *Republic of the Philippines v. Marcos*, 806 F.2d 344, 359 (2d Cir.1986). We have noted that

the policy concerns underlying the doctrine require that the political branches

be preeminent in the realm of foreign relations. Accordingly, the Supreme Court has directed that each case be analyzed individually to determine the need for a separation of powers: "the less important the implications of an issue are for our foreign relations, the weaker the justification for exclusivity in the political branches."

*Braka*, 762 F.2d at 224 (quoting *Sabbatino*, 376 U.S. at 428, 84 S.Ct. 923; other citations omitted). Additionally we have said that "[t]he doctrine demands a case-by-case analysis of the extent to which in the context of a particular dispute separation of powers concerns are implicated[,] ... always ... tempered by common sense." *Allied Bank Int'l*, 757 F.2d at 521.

[T]he applicability of the doctrine depends on the likely impact on international relations that would result from judicial consideration of the foreign sovereign's act. If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act.

*Id.* at 520–21 (citing, *inter alia, Sabbatino*, 376 U.S. at 427–28, 84 S.Ct. 923; footnote omitted).

█ We conclude that the resolution of this case by United States courts will not "likely impact on international relations" or "embarrass or hinder the executive in the realm of foreign relations."

In *Sabbatino*, the Court remarked that "[t]he balance of relevant considerations

---

**7.** We have referred to the act of state doctrine as a principle of abstention, *see Banco Nacional De Cuba v. Chemical Bank New York Trust Co.*, 822 F.2d 230, 235 (2d Cir.1987); *Hunt v. Mobil Oil Corp.*, 550 F.2d 68, 74 (2d Cir.1976), and treat it in this discussion as though it were. There have been suggestions elsewhere that it is a "principle of decision" or a "rule of decision" which we understand would differ from a principle of abstention in that the court would be required to assume the foreign state's actions in issue are valid and render a binding judgment on the merits on that assumption instead of abstaining from deciding the case on the merits. *See W.S.*

*Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 427, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Ricaud v. American Metal Co.*, 246 U.S. 304, 309–10, 38 S.Ct. 312, 62 L.Ed. 733 (1918); *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir.1992). We do not think that we need choose between these views. We hold that the act of state doctrine is not applicable in this case whether it is a doctrine of abstention and reviewable for abuse of discretion or a "principle of decision" presumably reviewable using some less deferential test.

may ... be shifted if the government which perpetrated the challenged act of state is no longer in existence." 376 U.S. at 428, 84 S.Ct. 923; *accord Kirkpatrick,* 493 U.S. at 409, 110 S.Ct. 701 (dictum). Plaintiffs assert that "[t]he Nasser government," which effected the expropriation, "is no longer in existence." Appellants' Br. at 47. Defendants respond that "[t]he heads of state may have changed, but the government has remained the same." Appellees' Br. at 41.

We cannot resolve the question thus posed, at least not on the record before us. But there is little doubt that the Egyptian government that is now in power is far removed in time and circumstance from that which seized the Bigios' property. The expropriation took place thirty-four or more years ago; President Nasser has been dead for thirty years.

The rationale for considering a change in government is that "the danger of interference with the Executive's conduct of foreign policy is surely much less than the typical case where the act of state is that of the current foreign government." *Marcos,* 806 F.2d at 359. Applying that rationale to this case, whether the present government is characterized as the same as or different from the one responsible for the expropriation, the danger of interference with the executive's branch's conduct of foreign policy by a court's adjudication here is dim indeed.

Moreover, the current government, as we have noted, has apparently repudiated the acts in question and has sought to have the property or its proceeds returned to the Bigios. Any finding of impropriety with respect to Egyptian expropriation of Jewish-owned property in the early 1960's would more likely be consonant, than at odds, with the present position of the Egyptian government. *See Dominicus Americana Bohio v. Gulf & Western Indus.,* 473 F.Supp. 680, 690 (S.D.N.Y.1979) ("[A]n act that would otherwise be immune from judicial inquiry may lose its privileged status if the government repudiates it."). There are no seeds for "embarrass[ment] or hind[rance of] the executive in the realm of foreign relations" that we can perceive. *Allied Bank Int'l,* 757 F.2d at 521.

■■■ The district court did not consider the fact that the Nasser regime is long gone, and it discounted the letter of the Egyptian Ministry of Finance directing Misr to return the Heliopolis property to the Bigios because it found that "plaintiffs have not provided any evidence regarding the legal effect of the letter." There is little ambiguity on the face of the Ministry of Finance letter; it appears to reflect a determination that the property in question rightfully belongs to the Bigios and not Misr. As pointed out in the affidavit of Ahmed G. Abou Ali, an Egyptian lawyer, which the defendants submitted to the district court, the Ministry of Finance letter states in clear terms, "Mr. Josias Raphael Nessim Bigio is the owner of the shares pertaining to the real estate properties [in Heliopolis listed below] ... which have previously been sold to [Misr]." We also note that the burden of proof rests on defendants to justify application of the act of state doctrine, *see Alfred Dunhill of London, Inc. v. Republic of Cuba,* 425 U.S. 682, 694, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976); *Marcos,* 806 F.2d at 359, in which case it would likely have been for the defendant to present evidence resolving the asserted ambiguity in its favor.

We are unable to see how any decision that the district court might make would offend the government of Egypt or interfere with the relationship between Egypt and the United States. The decision of the district court to invoke the act of state doctrine was therefore and to that extent in error.

### B. International Comity

The defendants argued to the district court that it should decline jurisdiction over this action pursuant to the principles of international comity. Because the district court dismissed the plaintiffs' state-law claims for what it considered lack of

subject matter jurisdiction pursuant to the act of state doctrine, it did not reach this issue. The defendants have renewed their international comity argument on appeal.

 International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). It may (although it does not in this case) take the form of "a discretionary act of deference by a national court to decline to exercise jurisdiction in a case properly adjudicated in a foreign state." *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047 (2d Cir.1996); *see, e.g., Allstate Life Ins. Co. v. Linter Group, Ltd.*, 994 F.2d 996 (2d Cir.) (affirming dismissal in favor of pending proceeding in Australia), *cert. denied*, 510 U.S. 945, 114 S.Ct. 386, 126 L.Ed.2d 334 (1993). When a court dismisses a complaint in favor of a foreign forum pursuant to the doctrine of international comity, it declines to exercise jurisdiction it admittedly has. *See Finanz AG Zurich v. Banco Economico S.A.*, 192 F.3d 240, 245–46 (2d Cir.1999) (treating separately the questions of subject matter jurisdiction and deferral to a foreign forum pursuant to international comity); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 928–30, 932 (2d Cir.1998) (same); *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1222 (11th Cir.1999) (noting that relevant question is whether court should abstain from hearing claims "despite the existence of jurisdiction" over those claims); *cf. Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796–98 & n. 24, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993) (separating question of subject matter jurisdiction under Sherman Act from question of international comity, which might recommend against exercise of jurisdiction); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 371–72 (2d Cir.1997) (treating separately "due regard for principles of international comity" and the court's "power to enjoin a foreign suit by persons subject to its jurisdiction"). The decision whether to dismiss a case on international comity grounds ordinarily lies within the discretion of the district court. *See Finanz AG Zurich*, 192 F.3d at 246; *Jota v. Texaco, Inc.*, 157 F.3d 153, 160 (2d Cir.1998).

 The questions that would be addressed by the district court in this case would appear to include (1) whether the plaintiffs' property in Egypt was wrongfully seized by the Egyptian government during the early 1960's, at which time the plaintiffs were living in Egypt, and (2) whether the plaintiffs' have rights to that property. The answer to the second question may depend on the answer to the first; it may also, however, depend on the legal effect of the 1977 edict and subsequent instructions issued by the Egyptian government with respect to the Bigios' property. In addition, one of the claims implicit in the plaintiffs' complaint, which they have indicated an intent to litigate, is for trespass to land located in Egypt. This lawsuit's connection to Egypt is therefore undeniably strong. By contrast, the only connection between this lawsuit and the United States of which we have been made aware is the identity of the defendants as United States corporations. Under these circumstances and on the basis of the information before us, we cannot say that retention of jurisdiction would be the only possible course of action for the district court.

But, on the other hand, we cannot say that dismissal on grounds of international comity is the sole result consistent with a proper exercise of the district court's discretion. The district court did not consider, among other things, "whether an adequate forum exists in [Egypt] and whether the defendant[s] sought to be sued in the United States forum [are] subject to or [have] consented to the assertion of jurisdiction against [them] in the foreign forum." *Jota*, 157 F.3d at 160. And we do not think this case falls within the category of "extreme cases ... where a foreign sovereign's interests [are] so legitimately affronted by the conduct of litigation in a United States forum that dismissal is war-

ranted without regard to the defendant[s'] amenability to suit in an adequate foreign forum." *Id.* Thus, even after factoring in the "court's normal duty to adjudicate a controversy properly before it," *Hachamovitch,* 159 F.3d at 693 (citation and internal quotation marks omitted), we cannot on the present record say for certain that it would be an abuse of discretion to decide the international comity question one way or the other. Neither can we reach the merits of the parties' dispute without resolving the issue of whether the dispute should be heard by United States courts at all under principles of international comity.

We therefore do not decide whether the plaintiffs failed to state a claim or to present sufficient evidence to overcome the defendants' motion in the alternative for summary judgment. Instead, we remand the case to the district court for it to decide in the first instance whether its deciding the cause is consistent with principles of international comity.

### III. Miscellaneous Issues

#### A. Failure to Join Indispensable Parties

The defendants argue that a decision in their favor may be rendered on the basis of the plaintiffs' failure to join two indispensable parties, Misr and the Arab Republic of Egypt. Because the issues relating to Rule 19 were briefed only cursorily before this Court and were not ruled on by the court below, we decline to consider the plaintiffs' alleged failure to join Misr and the Arab Republic of Egypt at this juncture. *See Thompson v. County of Franklin,* 15 F.3d 245, 253 (2d Cir.1994) ("The preferred practice of this Circuit . . . is to remand the issue for consideration by the district court in the first instance where, as here, . . . 'a theory has been briefed and argued only cursorily in this Court.'" (quoting *Poloron Prods. v. Lybrand Ross Bros. & Montgomery,* 534 F.2d 1012, 1018 (2d Cir.1976))).

#### B. Statute of Limitations

■ The defendants argue that the plaintiffs' claims are time-barred because the plaintiffs failed to bring suit within the required statutory periods of limitation. The district court did not reach this issue, nor do we.

The New York statute of limitations governing the plaintiffs' state-law claims is an ordinary, non-jurisdictional statute of limitations subject to equitable doctrines such as waiver and estoppel. *See* N.Y. C.P.L.R. 3211(e) (stating that statute of limitations defenses may be waived); *Simcuski v. Saeli,* 44 N.Y.2d 442, 448–49, 406 N.Y.S.2d 259, 262, 377 N.E.2d 713, 716 (1978) ("It is the rule that a defendant may be estopped to plead the Statute of Limitations where plaintiff was induced by fraud, misrepresentations or deception to refrain from filing a timely action."); *Mendez v. Steen Trucking, Inc.,* 254 A.D.2d 715, 716, 680 N.Y.S.2d 134, 136 (4th Dep't 1998) ("A Statute of Limitations defense is waivable, and failure to raise it does not deprive the court of jurisdiction." (citation omitted)). *See generally Zipes v. Trans World Airlines, Inc.,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982) (distinguishing between jurisdictional prerequisites to suit and statutes of limitations, which are subject to waiver, estoppel and equitable tolling).

■ The plaintiffs' alleged failure to comply with the relevant statutes of limitations, like their alleged failure to comply with Rule 19, does not touch upon the jurisdiction either of the district court or of this Court. And like the issues relating to Rule 19, the issues relating to the timeliness of the plaintiffs' state-law claims were briefed only cursorily before this Court and not ruled on by the district court. We therefore need not and do not address the defendants' argument based on the statute of limitations. It is an issue to be decided in the first instance, if at all, by the district court. *See Thompson,* 15 F.3d at 249.

### CONCLUSION

For the foregoing reasons, the judgment of the district court is reversed and re-

manded for further proceedings consistent with this opinion, the first of which is to determine whether dismissal is warranted pursuant to the principles of international comity.