FILMS BY JOVE, INC., and
Soyuzmultfilm Studios,
Plaintiffs,

v.

Joseph BEROV, Natasha Orlova, the
Rigma America Corporation, and
Saint Petersburg Publishing House
and Group, Defendants.

Federal State Unitarian Enterprise
Soyuzmultfilm Studio, Third
Party Plaintiff,

v.

Films by Jove, Inc, and Soyuzmultfilm
Studios, Third Party Defendants.

No. CIV.A.98–CV–7674(DGT).

United States District Court,
E.D. New York.

Nov. 5, 2004.

Julian H. Lowenfeld, New York, NY, Kenneth A. Feinswog, Los Angeles, CA, for Film by Jove, Inc.

Julian H. Lowenfeld, New York, NY, for Soyuzmultfilm Studios.

Paul R. Levenson, Kaplan & Levenson, LLP, New York, Scott Alan Ziluck, Kaplan & Levenson, LLP, New York, NY, for Joseph Berov, The Rigma America Corp., St. Petersburg Publishing House and Entertainment Group, Natasha Orlova.

Robert W. Clarida, Cowan, Liebowitz & Latman, P.C., New York.

## MEMORANDUM & ORDER

TRAGER, District Judge.

This is a motion pursuant to Rule 60(b), Fed.R.Civ.P., to vacate or modify this court's memoranda and orders of August 27, 2001 and April 16, 2003 (amended May 8, 2003) as well as the judgments of November 26, 2003 and December 2, 2003 for the plaintiff Films by Jove, Inc. ("Films by Jove"). The instant motion, dated May 21, 2004, is founded on Russian Federation Directive No. 1882–r, dated December 24, 2003 (the "December 24, 2003 Directive"). Defendants Joseph Berov, the Rigma American Corporation d/b/a Saint Petersburg Publishing House and Group, and Third–Party Plaintiff Federal State Unitarian Enterprise Soyuzmultfilm Studio ("FSUESMS") (collectively, "defendants") allege that the December 24, 2003 Directive constitutes a basis for reconsideration under Rule 60(b) clauses (2), (5) or (6) as newly-discovered evidence clarifying the appropriate interpretation of the law or, alternatively, as a retroactive change in the law.

## Background

The facts of this case were fully described in the court's initial opinion, *Films by Jove v. Berov*, 154 F.Supp.2d 432 (E.D.N.Y.2001) (*"Films by Jove I"*) (granting the plaintiff Films by Jove's motion for summary judgment). The developments in the case were further discussed and analyzed in a second opinion, *Films by Jove v. Berov*, 250 F.Supp.2d 156 (E.D.N.Y.2003) (*"Films by Jove II"*), denying the defendants' first motion pursuant to rule 60(b). Therefore, only a brief summary of the facts will be given here.

### (1)

The main issue in this case is the validity of an exclusive copyright license for worldwide distribution outside of the former Soviet Union of approximately 1500 Russian animated films produced by the state-owned Soviet film studio Soyzmultfilm ("State Film Studio"). In 1992, a licensing agreement was signed between the plaintiff Films by Jove, a California corporation, and Soyuzmultfilm Studio, a lease enterprise, (the "Lease Enter-

prise"),[1] which was the legal successor to the State Film Studio. This licensing agreement gave Films by Jove an exclusive right to distribute the animated films internationally, but explicitly excluded the territory of the former Soviet Union from its scope. Relying on the licensing agreement, Films by Jove invested more than three million dollars to restore, update and revoice the Soyuzmultfilm film library.

In 1998, Films By Jove began this action against Joseph Berov for copyright infringement. Berov did not seriously dispute the issue of copyright infringement; instead Berov relied on a state-owned Russian company, the Federal State Unitarian Enterprise Soyuzmultfilm Studio ("FSUESMS"), which intervened as a third-party plaintiff and alleged that plaintiff Soyuzmultfilm Studios ("SMS")[2] as well as the Lease Enterprise was not the legal successor of the State Film Studio and had never possessed the right to license the copyrights. Therefore, defendants argued that the licensing agreement was invalid. FSUESMS claimed to be the legal successor to the State Film Studio and the true owner of the copyrights.

On August 27, 2001, summary judgment was granted in favor of plaintiff based on the factual evidence, submissions of the parties' Soviet law experts, Russian government documents and, partly, on the interpretations of the law provided by a series of decisions by the commercial courts of the Russian Federation that supported the plaintiff's position. This court

determined that under Soviet law the copyrights in the film library were the State Film Studio's property and were never that of the Soviet Government and, furthermore, that they passed to the Lease Enterprise by operation of law. Therefore, the Lease Enterprise lawfully gave Films by Jove an exclusive copyright license.

The defendants' interpretation of the Soviet and Russian laws at issue is dramatically different. According to their position, the copyrights always belonged to the state, not to the State Film Studio, and therefore could not have been transferred to the Lease Enterprise, which received only the tangible property of the State Film Studio in a ten-year lease. Alternatively, defendants argued that even if the State Film Studio held the copyrights, the state enterprise went into a period of "suspended animation" during the ten-year term of the lease. Accordingly, as the State Film Studio continued to exist, the copyrights were not transferred as a matter of law to the Lease Enterprise. *See Films by Jove II,* 250 F.Supp.2d at 181 (citing Maggs 2d Supp. Decl. ¶ 11). According to defendants, therefore, in 1999, when the term of the lease expired and FSUESMS filed its charter claiming to be the legal successor to the State Film Studio, it allegedly acquired the copyrights directly from the State Film Studio.

However, the defendants' version was not supported by the evidence. It is an

---

**1.** The Lease Enterprise was created as part of the ownership liberalization trend of Perestroika. "Many state companies became rent enterprises in the late 1980s and 1990s. In accordance with law, they stopped to be state-owned, but having in mind a further transition to privately held companies, they acquired another legal status...." *Films by Jove I,* 154 F.Supp.2d at 435 (citing Pls.' Ex. 15, Decl. of Mila Straupe) (internal quotation marks omitted).

**2.** On July 1, 1999, shortly before the expiration of the lease, the Lease Enterprise reorganized into a private stock company (the "SMS"). Although in its transformation into a joint stock company the Lease Enterprise seemed to follow the direction intended for lease companies, *see supra* note 1, its registration was found invalid by subsequent decisions of Russian courts.

incontestable fact that there was not the slightest indication of the State Film Studio's existence between 1989 and 1999. Furthermore, although the license was public knowledge, neither the State Film Studio—which presumably continued to exist—nor any other state agency challenged the Lease Enterprise's 1992 distribution agreement with Films by Jove until this copyright infringement action was filed in 1998. Therefore, this court concluded that these undisputed facts as well as Russian law belie FSUESMS's and defendants's arguments.

### (2)

Subsequently, defendants filed a motion pursuant to Rule 60(b)(2) for reconsideration of this court's August 27, 2001 decision based on the opinion by the Presidium of the High Arbitrazh Court of the Russian Federation, issued on December 18, 2001. The High Arbitrazh Court overruled two lower court opinions relied upon by this court in reaching its interpretation of Russian law. The December 18, 2001 decision undermined an important premise raised by plaintiff that the State Film Studio ceased to exist upon the execution of the Lease Agreement between the State Film Studio and Goskino. Goskino, translated literally from Russian, means "government film" and is a shorthand for the State Committee on Cinematography, the government ministry that, during the Soviet era, was generally responsible for overseeing all aspects of film production and internal distribution.

This court, while acknowledging that the opinion of the High Arbitrazh Court undermined one of the premises of its decision, denied the defendants' motion for reconsideration for two reasons. First, there were strong grounds for questioning the accuracy of the December 18, 2001 decision with regard to its interpretation of Russian law. The opinion did not offer any explanation as to what happened to the State Film Studio during the ten-year lease term. Furthermore, the High Arbitrazh Court did not directly discuss the critical premise relied on by this court in its initial decision that under Soviet law the initial ownership in copyrights remained with the State Film Studio as opposed to the state, which meant that the state was not in a position to grant any copyrights to FSUESMS. Second, there was persuasive evidence that the decision was the coordinated result of the efforts on the part of the Russian government to improperly use the courts to recapture property rights lost during privatization in Russia, and thereby expropriate without compensation the plaintiff's property rights in the lease and concomitantly cause the loss of the plaintiff's multi-million-dollar investment. Under these circumstances, this court denied the motion for reconsideration.

### (3)

This second motion pursuant to Rule 60(b) is filed by the defendants in reliance on Russian Federation Directive No. 1882-r, dated December 24, 2003 (the "December 24, 2003 Directive"). The December 24, 2003 Directive was issued several weeks after this court's judgment of December 2, 2003 in favor of Films by Jove admittedly in response to that decision and judgment. The Directive allegedly constitutes a "clarification" of the provision of Part I of the Government of Russian Federation Directive No. 1038-r, dated June 30, 1999 (the "June 30, 1999 Directive"), which purported to transfer the state property leased by the Lease Enterprise to a newly-formed state unitarian enterprise, FSUESMS, upon the expiration of the lease, but was silent regarding the issue of the transfer of copyrights.

The December 24, 2003 Directive states that its purpose is to establish "the uni-

form interpretation and application in practice" of the June 30, 1999 Directive. It then goes on to substitute the phrase "property system" for the word "property" and thus for the first time explicitly added copyrights to the picture.

The term "property system" is defined by Article 132 of the Russian Civil Code to include intangible property: "The composition of an enterprise as a property system includes all types of property designated for its activity, including land parcels, buildings, structures . . . and also rights to designations individualizing the enterprise, its products, work, and service (firm name, trademarks, service marks), and other exclusive rights, unless otherwise provided by a statute or contract." (Maggs 10th Supp. Decl. ¶ 8). The following phrase was also added at the end of the December 24, 2003 Directive: "having established the legal succession of the latter [FSUESMS] to the exclusive rights to the use of the audiovisual works filmed at the film studio from the time of creation up to the transfer to leasing relations." Taken together, these changes purport to establish that the government of the Russian Federation transferred the copyrights in the films to FSUESMS in 1999.

### Discussion

### (1)

### Validity and Relevance of the December 24, 2003 Directive

■ Although the parties agree that the June 30, 1999 and December 24, 2003 Directives are acts of the government of the Russian Federation, they differ as to the legal significance attributable to these documents.

Plaintiff's expert Dr. Pashin, a drafter of the Russian federal law "On Arbitrazh Courts in the Russian Federation" as well as other laws concerning judicial practice,

see *Films by Jove II*, 250 F.Supp.2d at 197 (citing Pashin Decl. ¶¶ 1–25), contests defendants' characterization of the weight to be given to the June 30, 1999 and December 24, 2003 Directives by pointing out that a directive (rasporiazheniye) has the least legal weight in the Russian legal hierarchy. Moreover, directives (rasporiazheniya) are not *per se* part of the Russian legal system, but are judicially reviewable individual acts of ministries, usually concerned with individual matters. (Pashin Decl. ¶¶ 5, 8).

The defendants contend that the government has legislative as well as executive functions (Maggs 10th Supp. Decl. ¶ 5) and claim that the Directives have a force of law arising out of Article 114 of the Russian Federation Constitution, which provides:

1. On the basis of and in execution of the Constitution of the Russian Federation, federal statutes, and normative edicts of the President of the Russian Federation the Government of the Russian Federation issues decrees and directives and ensures their performance.

2. Decrees and directives of the Government of the Russian Federation are obligatory for execution in the Russian Federation. (Maggs 10th Supp. Decl. ¶ 5).

In arguing about the legal significance of the December 24, 2003 Directive, defendants do not deny that its purpose was to assert ownership in the copyrights, which are a subject of "obviously significant Russian governmental interest." (Defendants' Memo of Law at 22). Defendants point out that the December 24, 2003 Directive was "issued only *after* this Court determined that plaintiff had the right to assert copyright claims in the Films and, further, that this Court was *not* going to accord comity to the [December 18, 2001 Deci-

sion], suggesting that the Russian Government itself perceived a need to 'weigh in' on the subject." (Defendants' Memo of Law at 22).

Not surprisingly, plaintiff correctly perceives the December 24, 2003 Directive as a transparent attempt on the part of the executive branch of the Russian government to modify or overturn existing Russian copyright legislation in order to rescind Films by Jove's legitimate property interests. (Newcity 3rd Supp. Decl. ¶¶ 10, 11). Plaintiff describes this as a taking of plaintiff's license rights, and, accordingly, argues that the December 24, 2003 Directive is unconstitutional under Article 35 of the Russian Federation Constitution, which provides that compulsory expropriation of property for state requirements may be carried out only if full compensation is paid in advance. (Newcity 3rd Supp. Decl. ¶ 12). Being unconstitutional, the December 24, 2003 Directive should not be enforced pursuant to Article 120 of the Constitution, which bans Russian courts from enforcing regulations or directives issued by the Russian Government that contravene the Russian Federation Constitution or federal law. (Newcity 3rd Supp. Decl. ¶ 8).

In their arguments for the legal validity of the December 24, 2003 Directive, defendants principally rely on a new decision by the High Arbitrazh Court of the Russian Federation of June 21, 2004. (Defendants Reply Memo of Law at 1). The new High Arbitrazh Court's decision was issued in response to a petition by plaintiff SMS to declare invalid the December 24, 2003 Directive as depriving SMS of its rights.[3] The High Arbitrazh Court of the Russian

Federation found the December 24, 2003 Directive constitutionally valid.

While the High Arbitrazh Court was specifically dealing with the rights that SMS obtained upon the expiration of the ten-year lease, its underlying premise, never explained, is that the state (Goskino) owned the copyright to the cartoon film library.

In its opinion, insofar as it is relevant to the issues before this court, the High Arbitrazh Court focused on paragraphs 1.2, 2.3 and 4.2 of the Lease Agreement between Goskino and the State Film Studio. It is common ground that the property referred to in paragraph 1.2 and transferred by the Lease Agreement encompassed only tangibles.

Next, according to the Hight Arbitrazh Court, the films referred to in paragraph 2.3 which were made at the expense of the funds of the State Committee of Cinematography (Goskino) are owned by Goskino and not by the State Film Studio, and, according to paragraph 4.2, the disposition of rights in films made by the studio with such financial support could only be provided to the lessee on a contractual basis and there were no such provisions in the Lease Agreement. (Decision of the High Arbitrazh Court at 4).

There are many problems with this analysis.

First, plaintiff's expert Rimma Yerokhina, who represented SMS at the High Arbitrazh Court, points out that, as a matter of fact, the films made prior to the Lease Agreement had never been financed by Goskino and, moreover, none of the

---

3. It may well be that, for unrelated reasons, SMS may not have been the legitimate successor to the copyrights that were transferred to the Lease Enterprise, and this court has never purported to resolve any of those questions. The only issue before this court is whether the Lease Enterprise obtained the copyrights to the cartoon films in question here from the State Film Studio and thus was in a position to enter into a license agreement with Films By Jove.

parties was asked to discuss the provisions of the Lease Agreement at the hearing leading up to the June 21, 2004 decision, which provisions became a fundamental reason for the Court's decision. (Suppl. Dec. of Rimma Yerokhina at 7).

Second, plaintiff's expert Dr. Pashin persuasively contends that the High Arbitrazh Court's reliance on these paragraphs of the Lease Agreement is misplaced and that paragraphs 2.3 and 4.2 cannot be interpreted as supporting the argument that Goskino was the copyright owner of the films at issue here. (Pahin Supp. Decl. ¶ 17). He also points out that Goskino itself had reported to the State Duma of the Russian Federation that the studios—and not the state—owned copyrights in the films produced by them according to Article 486 of Civil Code of the Russian Soviet Federated Socialist Republic. (Exh. A to Pashin Supp. Decl.). Moreover, paragraph 2.3 of the Lease Agreement could only relate to future production of films because it delineates the special circumstances when Goskino would own the referenced copyright. This provision would not be necessary if Goskino already owned or retained all the copyrights in all circumstances. (Pahin Supp. Decl. ¶¶ 18, 19).

That the interpretation of the Lease Agreement refers exclusively to future films is also supported by the reading of those provisions in the context of the entire Lease Agreement. For example, section 2 is entitled "Rights and Responsibilities of the Lessee." In total, it describes the scope of activity of a newly-formed lease enterprise, such as preparing annual fiscal plans, hiring employees, distributing income and so on. Paragraph 2.2 directly preceding paragraph 2.3 at issue here states that the lease enterprise "shall produce and sell films ... created by the studio at its own expense...." (Lease Agreement § 2.2). In light of this provi-

sion, paragraph 2.3 is clearly a reference to films that would be produced with the help of Goskino funds in the course of some future activity of the Lease Enterprise. This understanding is in complete harmony with defendants' expert Professor Maggs' explanation of Goskino's aspiration regarding its future role as a financier of film industry in Russia. (Maggs 12th Supp. Decl. at 4). In the same vein, paragraph 4.2 read in context also deals with rights to the "realization of products" created by the Lease Enterprise after the signing of the Lease Agreement. Like paragraphs 2.2 and 2.3, it draws a line between films produced by the Lease Enterprise at its own expense and those produced at the expense of Goskino pointing out that "realization of the products, created by the lessee at the expense of its own finances, is carried out by him independently," but "the right of realization of films ... prepaid by Goskino ... can be granted to the lessee on the contractual basis by the lessor." (Lease Agreement). In sum, the High Arbitrazh Court's attempted application of the provisions of the Lease Agreement to films produced at the State Film Studio prior to the Lease Agreement is an unacceptable distortion of the Agreement and is completely unsupported by any persuasive legal argument.

Furthermore, and of equal significance, the High Arbitrazh Court did not discuss the basic premises of this court's rulings and, therefore, the opinion has little relevance for the issues considered in this case. These premises were that under Article 486 of the Civil Code of the Russian Soviet Federated Socialist Republic, which dated back to 1964, the copyrights were owned by the State Film Studio and were subsequently transferred to the Lease Enterprise by operation of law according to Article 498 of the Civil Code. In addition, the High Arbitrazh Court did not discuss the fact that there was not a single

piece of evidence for the continued existence of the State Film Studio from 1989 to 1999. (Rimma Erokhina Supp. Decl. ¶¶ 5, 6).[4]

The High Arbitrazh Court's opinion does not and cannot gainsay the answer given by this court (and lower Russian courts) to the crucial question whether at the time of the June 30, 1999 Directive the government actually had any copyrights to transfer. The bases of the opinions in *Films by Jove I* and *Films by Jove II* were that going back to Stalinist times the State Film Studio was the owner of copyrights, which were transferred by operation of law to the Lease Enterprise in 1989 and thus enabled the Lease Enterprise to grant the copyright license to Films by Jove. These premises were not in any way undermined either by the December 24, 2003 Directive purportedly clarifying the intention of the Russian government to transfer the copyrights—which it did not own—to FSUESMS in 1999, or the decision of the High Arbitrazh Court of the Russian Federation finding the December 24, 2003 Directive valid and applicable.

In sum, while the High Arbitrazh Court's decision of June 21, 2004 has some relevance to this litigation, it does so only because it continues to assume that the state, rather than the State Film Studio, owned the copyrights. This assumption is not addressed, much less justified. As for the December 24, 2003 Directive, despite the defendants' efforts to claim the opposite, it is a far cry from being merely a "clarification." Moreover, it provides further evidence of continued actions being taken by the Russian government and judiciary to influence the outcome of this

United States litigation with the purpose of depriving plaintiff Films by Jove of its right to distribute the animated films in the United States and elsewhere outside of the former Soviet Union. To quote plaintiff's expert Professor Newcity of the Duke University School of Law: "[The December 24, 2003 Directive] represented a fundamental change from prior Russian law, which had consistently provided that motion picture studios owned the copyrights in their films, . . . This Directive is a transparent attempt on the part of the Russian Government to modify or overturn existing Russian copyright in order to rescind the Plaintiffs' legitimate property interests in these films after the fact." (Newcity 3rd Supp. Decl. ¶¶ 10, 11).

(2)

### The Validity of the December 24, 2003 Directive in the Context of the Act of State Doctrine

Defendants argue that the act of state doctrine precludes the courts of this country from inquiring into the validity of the public acts of a recognized foreign sovereign power committed within its own territory. *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964). Defendants further note that, under the doctrine, a foreign sovereign's public acts within its borders are given effect by United States courts even when those acts contravene U.S. public policy. *Banco Nacional*, 376 U.S. at 436–437, 84 S.Ct. 923. Finally, defendants contend that plaintiffs may not challenge the legal validity of the December 24, 2003 Directive under Russian law, relying on *Republic of the Philippines v. Marcos*, 818 F.2d 1473, 1483 (9th Cir.1987). *See id.*

---

**4.** In *Films by Jove II,* this court noted that "despite an explicit request from this court, *see* Tr. of Apr. 9, 2002 Oral Arg. at 61, defendants have introduced no evidence that the Ministry of Property, Goskino, or any other agency of the Russian government granted any copyright licenses or took any action whatsoever with respect to the Soyuzmultfilm Studio copyrights during the ten-year lease term." 250 F.Supp.2d at 213.

("since the act of state doctrine prohibits inquiry into the legality of official governmental acts, such acts surely cannot be official only if they are legal"); *see also Bernstein v. Van Heyghen Freres S.A.*, 163 F.2d 246, 249–50 (2d Cir.1947), *cert. denied*, 332 U.S. 772, 68 S.Ct. 88, 92 L.Ed. 357 (1947) (rejecting attack on Nazi confiscations based on failure to comply with German law); *Banco de Espana v. Federal Reserve Bank of New York*, 114 F.2d 438, 443 (2d Cir.1940) (noting that the courts of this country will not examine the acts of a foreign sovereign within its borders, in order to determine whether or not those acts were legal under the municipal law of the foreign state).

■ However, the application of the act of state doctrine has no relevance in this case because the doctrine refers to acts of a foreign state committed within its own territory. It is well-settled law that the act of state doctrine does not extend to takings of property located outside the territory of the acting state at the time of the taking, even if the property belonged to an enterprise based in that state. *Restatement Third of the Foreign Relations Law of the United States*, 443, Reporter Note 4; *Alfred Dunhill of London v. Republic of Cuba*, 425 U.S. 682, 687, 96 S.Ct. 1854, 48 L.Ed.2d 301 (1976). *See also Bandes v. Harlow and Jones, Inc.*, 852 F.2d 661, 666–67 (2d Cir.1988); *Allied Bank International v. Banco Credito Agricola de Cartago*, 757 F.2d 516 (2d Cir.1985); *United Bank, Ltd. v. Cosmic International, Inc.*, 542 F.2d 868 (2d Cir. 1976); *Menendez v. Saks & Co.*, 485 F.2d 1355 (2d Cir.1973); *Republic of Iraq v. First National City Bank*, 353 F.2d 47, 51 (2d Cir.1965), *cert. denied*, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540 (1966).

Plaintiff claims that the situs of the exclusive copyright license is not within the borders of the Russian Federation because the territory of the Russian Federation is specifically excluded from the scope of its application. Therefore, no extraterritorial effect can be given to a ministerial act expropriating Films by Jove's copyright license outside the Russian Federation.

The courts are unanimous in their conclusion that "the situs of intangible property is about as intangible a concept as is known to the law." *Tabacalera Severiano Jorge v. Standard Cigar Co.*, 392 F.2d 706, 714 (5th Cir.), *cert. denied*, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed.2d 260 (1968). However, there are two main groups of cases considering the situs of intangible property for the purpose of the act of state doctrine.

The first group deals with the situs of United States registered trademarks. Generally, the courts have viewed the situs of the right to use a trademark or to market products "to be in that nation granting the marketing rights or the right to use the trademark itself rather than in that nation in which the person or company who was given the right to use the trademark or who manufactures the product is located." 12 A.L.R. Fed. 707 § 14(b). This position is supported by the rulings in *Zwack v. Kraus Bros. & Co.*, 237 F.2d 255 (2d Cir.1956); *F. Palicio y Compania v. Brush*, 256 F.Supp. 481, 490–93 (S.D.N.Y.1966), *affirmed* 375 F.2d 1011 (2d Cir.1967), *cert. denied*, 389 U.S. 830, 88 S.Ct. 95, 19 L.Ed.2d 88 (1967); *Maltina Corp. v. Cawy Bottling Co.*, 462 F.2d 1021 (5th Cir.1972), *cert. denied*, 409 U.S. 1060, 93 S.Ct. 555, 34 L.Ed.2d 512 (1972). In these cases, courts have refused to give the foreign governments' expropriation decrees extraterritorial effect regarding trademarks of the expropriated firms that were registered in the United States. Plaintiff relies on these cases in arguing that the location of the copyright license is in the United States. In support of the plaintiff's position it should be noted that

the judgment of November 26, 2003 explicitly relates to the films registered in the United States. However, it can be argued that copyrights are distinguishable from the above-discussed trademark cases because copyrights, unlike trademarks, are often not so limited by location.

The second group of cases deals with the situs of debt owed to United States companies by foreign banks. The Second Circuit suggested determining the situs of the debt by looking at whether the purported taking can be said to have "come to complete fruition within the dominion of the [foreign] government." *Allied Bank Int'l,* 757 F.2d at 521. In *Allied,* the court held that the government of Costa Rica cannot completely extinguish the obligation of its banks to pay Allied in United States dollars in New York and found the situs of the debt to be in the United States. The *Allied* court further added that the "acts of foreign governments purporting to have extraterritorial effect . . . should be recognized by the courts only if they are consistent with the law and policy of the United States." *Id.* at 522. A similar analysis was applied in *Braka v. Bancomer. See Braka v. Bancomer,* 762 F.2d 222 (2d Cir. 1985) (situs of debt deemed to be in Mexico where the plaintiffs, United States citizens, purchased peso and dollar certificates of deposits from a Mexican bank and the principal and interest had to be paid in Mexico); *see also Garcia v. Chase Manhattan Bank,* 735 F.2d 645 (2d Cir.1984) (situs of the debt deemed outside of Cuba because two certificates of deposit issued by Chase's Cuba branch provided that they were redeemable at any Chase branch worldwide).

*Optopics Laboratories Corp. v. Savannah Bank of Nigeria,* 816 F.Supp. 898 (S.D.N.Y.1993), advances this reasoning as well. In *Optopics Laboratories Corp.,* the defendant, Savannah Bank of Nigeria, failed to pay on the Letter of Credit, under which the plaintiff, an assignee, had a right to receive proceeds in United States dollars at a bank in New York. The defendant claimed that it was unable to remit United States dollars to Bank of America due to the failure of the Central Bank of Nigeria to provide foreign exchange. The *Optopics Laboratories* court held that because "the Nigerian government's attempt to unilaterally modify a private letter of credit contract is against the law and policy of the United States, this Court will not enforce the Nigerian policy extraterritorially." 816 F.Supp. at 907.

 It would appear that plaintiff's argument that its copyright distribution license is located within the United States is better supported by this line of cases looking at the situs of debt. Similar to the test applied in *Allied,* it can be determined that the obligations under the copyright license come to fruition in the United States, because the license grants exclusive distribution rights in the United States and excludes the territory of the former Soviet Union.

In response, defendants argue against the determination that the situs of the exclusive copyright license in this case is the United States by contending that plaintiff cannot be considered an owner of copyright. Defendants contend that "a single copyright can have only one author and one country of origin." (Defendants Reply Memo at 10). On its face this statement seems to contradict Subsection 201(d)(2) of the Copyright Act, which provides: "Any of the exclusive rights comprised in a copyright . . . may be transferred . . . and *owned* separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title." 17 U.S.C. § 201(d)(2) (2000) (emphasis add-

ed). In their interpretation of Subsection 201(d)(2), defendants rely on *Morris v. Business Concepts, Inc.,* 259 F.3d 65, 69 (2d Cir.2001), for the proposition that "the owner of a particular right—as opposed to copyright itself—would not be a copyright owner." Defendants conclude that, accepting the plaintiff's version of the facts, SMS and its predecessor, the Lease Enterprise, are owners of the copyrights. Both entities being Russian companies, the defendants allege that the situs of the copyrights is in Russia. (Defendants Reply Memo at 10).

However, defendants' reliance on this precedent is unpersuasive because of two main factors. First, *Morris* deals with a separate issue from the one considered here, namely the copyright ownership for the purpose of the Act's registration requirement. In *Morris,* the court found that the registration of a collective work was not sufficient for an infringement action under § 411(a) for the constituent part because an exclusive licensee is not a copyright owner for the purposes of § 411(a). *Morris,* 259 F.3d at 69. Clearly, the conclusion that an exclusive licensee is not a copyright owner for registration purposes cannot be automatically transferred to a copyright ownership determination for the purpose of the situs of copyright under the act of state doctrine. The policies at issue in the two situations are quite different. Second, and even more significantly, in its subsequent decision denying the petition for rehearing, *Morris v. Business Concepts, Inc.,* 283 F.3d 502 (2d Cir.2002), the Second Circuit removed the total part of its previous decision relied on by the defendants because "it might significantly affect some future case." *Id.* at 503. The Second Circuit explained that "in saying that 'an owner of a particular right—as opposed to the copyright itself— would not be a copyright owner' ... we relied upon the great copyright treatise, 3

Melville B. Nimmer & David Nimmer, Nimmer on Copyright § 10.02[C][2], at 10–28 (2000)." *Id.* at 503 (internal citation omitted). The court further clarified that "while Nimmer is supported by at least one other treatise ... others are not so clear or perhaps are even contrary." *Id.* The Second Circuit further noted:

> We recognize that the language of Section 101 itself, and of the Supreme Court in the recent case *New York Times Co., Inc. v. Tasini,* 533 U.S. 483, 121 S.Ct. 2381, 150 L.Ed.2d 500 (2001), casts serious doubt upon the question whether there may be only 'a single copyright in a work.' ... And the Supreme Court as part of its approach to the collective work problem, said that " "The 1976 Act rejected the doctrine of indivisibility, recasting the copyright as a bundle of discrete 'exclusive rights,' 17 U.S.C. § 106 (1994 ed. and Supp. V), each of which 'may be transferred ... and owned separately.' § 201(d)(2)." *Tasini,* 121 S.Ct. at 2388–89." *Morris,* 283 F.3d at 504.

The modification by the Second Circuit of its decision in *Morris,* as well as the reasons given for it, amply shows that *Morris* cannot be cited to support the defendants' claim that the situs of the license is in Russia because the underlying copyrights are allegedly owned by a never-specified Russian entity. Furthermore, the case indicates that an exclusive licensee of the copyright may be treated as an owner of a specific "exclusive right."

While this court is not aware of any American case precisely on point, the issue of the situs of an exclusive copyright license was recently considered by the English Court of Appeals in the case of *Peer Int'l Corp. v. Termidor Music Publishers Ltd.,* 2003 E.M.L.R. 34, *available at* 2003 WL 21554794 (Cal.Ct.App. July 30, 2003).

In that case, the Court of Appeals considered the issue of ownership of exclusive licenses to copyrights in certain musical works created in Cuba by Cuban nationals and licensed to a U.K. company between 1930's and the 1950's. After the revolution in Cuba, the Cuban government enacted a law that came into effect in August of 1960 and proclaimed null and void all prior licensing contracts not approved by the state agency. The English court found Cuban law to be confiscatory and refused to apply it to exclusive licenses which the Court of Appeals determined were located in the U.K. Significantly for the case at bar, the English court characterized the exclusive licenses as property and held that the situs after the execution of the license agreements in Cuba was in the United Kingdom. *Id.* at 789. Thus, under the English Court's reasoning, for the purpose of the act of state doctrine the situs of the exclusive right owned by Films by Jove is in the United States as the location of the rights to distribute the licensed films as well as the domicile of plaintiff Films by Jove.

Defendants also contend that under *Itar–Tass Russian News Agency v. Russian Kurier, Inc.*, 153 F.3d 82, 89 (2d Cir.1998), the situs of the copyrights is Russia because the principal issue is the ownership of copyrights which originated in Russia and therefore the only relevant law is Russian. (Defendants' Reply Memo at 10). However, here defendants conflate the conflict-of-laws principles underlying the *Itar–Tass* decision with the policy considerations underlying the act of state doctrine. There is no doubt that the taking alleged by plaintiff has its primary extraterritorial effect in the United States. Similar to *Optopics Laboratories*, here, the attempt of the Russian government to unilaterally modify a private contract to be performed in the United States is against the law and policy of the United States and, therefore, should not be enforced extraterritorially.

Although unnecessary in light of the determination above, plaintiff makes an alternative argument that even assuming the December 24, 2003 Directive does not have an extraterritorial effect, the act of state doctrine is barred by the exception to the doctrine called the Second Hickenlooper Amendment.

In response to this argument, defendants contend that the Second Hickenlooper Amendment is not applicable to this case because the Amendment does not cover intangible property and contractual rights. This position is supported by a number of cases decided by the Second Circuit that limit the Second Hickenlooper Amendment by holding that it does not relate to intangible property. *See Zappia Middle East Constr. Co. v. Emirate of Abu Dhabi*, No. 94 Civ.1942(KMW), 1996 WL 413680 (S.D.N.Y. July 24, 1996); *French v. Banco Nacional de Cuba*, 23 N.Y.2d 46, 295 N.Y.S.2d 433, 242 N.E.2d 704 (1968). This narrow interpretation is criticized by some courts as too formalistic. *See, e.g., West v. Multibanco Comermex, S.A.*, 807 F.2d 820, 829–30 (9th Cir.1987) (noting that this exclusion is "contrary to the motivating policies of the Hickenlooper Amendment"). Although there is a split between the circuits on this issue, the Second Circuit precedential law does not allow the conclusion that the expropriation in this case is within the scope of the Second Hickenlooper Amendment.

However, even denying the extension of the Second Hickenlooper Amendment to intangible property, the Second Circuit excludes cases with expropriated intangible property from the act of state doctrine when it finds that the property was located in the United States based on a "complete fruition" test discussed above. *See supra.*

Similarly, the act of state doctrine is not applicable in this case because the situs of the copyright license here is, and was at the moment of enactment of the December 24, 2003 Directive, within the United States.

Although the above-mentioned considerations lead to the conclusion that the act of state doctrine should not be applied in this case, there is still another basis for not recognizing the expropriatory December 24, 2003 Directive. All the sources are unanimous that the act of state doctrine is principally directed at initial examination by the United States courts of the validity of a foreign sovereign act. *See* Restatement Third of the Foreign Relations Law of the United States § 443(1) (1986). The basis of the doctrine is the restraint exercised by the judiciary in light of separation-of-powers considerations as well as respect for foreign sovereigns and justiciability concerns. "Like the doctrine of sovereign immunity, the act of state doctrine springs 'from the thoroughly sound principle that on occasion individual litigants may have to forgo decision on the merits of their claims because the involvement of the courts in such a decision might frustrate the conduct of the Nation's foreign policy.'" *Callejo v. Bancomer,* 764 F.2d 1101, 1113 (5th Cir.1985) (citing *First National City Bank v. Banco Nacional de Cuba,* 406 U.S. 759, 769, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972)). *Sabbatino* based the act of state doctrine on prudential considerations. *Sabbatino,* 376 U.S. at 421–23, 84 S.Ct. 923. The act of state doctrine is also grounded on separation-of-powers principles. "[The doctrine's] continuing vitality depends on its capacity to reflect the proper distribution of functions between the judicial and political branches of the Government on matters bearing upon foreign affairs." *Id.* at 427–28, 84 S.Ct. 923.

The act of state doctrine is considered by some courts as a principle of abstention. *See Bigio v. Coca–Cola Co.,* 239 F.3d 440, 452 n. 7 (2d Cir.2000); *Banco Nacional De Cuba v. Chemical Bank New York Trust Co.,* 822 F.2d 230, 235 (2d Cir.1987); *Hunt v. Mobil Oil Corp.,* 550 F.2d 68, 74 (2d Cir.1977). An alternative approach is to treat the doctrine as a principle of decision differing from an abstention principle in that the court would be required to assume the foreign state actions at issue to be valid and render a binding judgment on the merits. *Bigio,* 239 F.3d 440, n. 7, (citing *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp.,* 493 U.S. 400, 406, 110 S.Ct. 701, 107 L.Ed.2d 816 (1990); *Sabbatino, supra; Ricaud v. American Metal Co.,* 246 U.S. 304, 309–10, 38 S.Ct. 312, 62 L.Ed. 733 (1918)). The Second Circuit in *Bigio* refrained from choosing one of the approaches. 239 F.3d 440.

■ In this case, it is also not necessary to choose one of these approaches. Both the doctrine of abstention and the rule of decision relate to the initial adjudication. The policy concerns underlying the doctrine change when a foreign government becomes a plaintiff and seeks to reopen a judgment adverse to it. In *Republic of Philippines,* the Second Circuit noted that "when a state comes into our courts and asks that our courts scrutinize its actions, the justification for application of the doctrine may well be significantly weaker." *Id.* at 1496. Here, FSUESMS, a Russian state agency, intervened in this copyright infringement case as a third-party plaintiff. By its intervention in the litigation, the Russian government, through its instrumentality FSUESMS, made it necessary for this court to interpret Russian law. However, when the judgment turned out to be in favor of plaintiff, FSUESMS decided to influence the outcome of the litiga-

tion by means of the December 24, 2003 Directive retroactively changing the law.

Research has not revealed any case involving reopening of a judgment on the ground of the act of state doctrine. Specific facts of this case do not involve the prudential considerations discussed in *Sabbatino*. Separation of powers considerations also take on a different meaning here because the policies behind independent judicial decision-making are threatened by acts of a foreign state attempting to influence the judicial process in the United States. In *United States v. Klein*, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1871), the Supreme Court held that "it is the intention of the Constitution that each of the great co-ordinate departments of the government—the Legislative, the Executive, and the Judicial—shall be, in its sphere, independent of the others." *Id.* at 147. In *Plaut v. Spendthrift*, 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995), the Supreme Court ruled that Securities Exchange Act section 27(b) contravened the Constitution's separation of powers by requiring federal courts to reopen final judgments entered before its enactment. *Id.* The Court reasoned that when the judicial branch issued a final judgment, to allow Congress to reopen the case by legislation would destroy the power of the judiciary to render final judgments. *Id.* at 219.

Considering the protective attitude of the courts to finality of judgments and the independence of the judiciary in interactions between branches of power within the United States, it would seem that, when presented with similar unacceptable acts by foreign governments, the situation would appear to be *a fortiori*. Plaintiff has submitted compelling evidence of the Russian government's improper influence on its own judiciary in this case. It would contradict the very principles at the foundation of the separation of powers doctrine

to allow a foreign state under the cover of the act of state doctrine to engage in activities that United States courts would not tolerate from the American legislature.

In sum, the act of state doctrine is not and should not be applicable to the facts of this case and does not require this court to reconsider its opinions and orders under Rule 60(b) because the situs of the exclusive copyright license is in the United States and also because the application of the act of state doctrine would not serve prudential considerations and separation-of-powers concerns at the heart of the doctrine, but instead would endanger the equally important policy of independent judicial decision-making.

(3)

### The December 24, 2003 Directive in the Context of Comity

■ Defendants also argue that their motion should be granted on the grounds of a nebulous interpretation of "comity." International comity has been defined as "the recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation." *Hilton v. Guyot*, 159 U.S. 113, 164, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The United States courts will defer to a foreign legal system if the effects of deference are consistent with the law and policy of the United States. Generally, comity takes the form of "a discretionary act of deference by a national court" declining to exercise its jurisdiction. *Bigio*, 239 F.3d at 454; *see also Hartford Fire Ins. Co. v. California*, 509 U.S. 764, 796–98 & n. 24, 113 S.Ct. 2891, 125 L.Ed.2d 612 (1993); *Filetech S.A. v. France Telecom S.A.*, 157 F.3d 922, 928–30, 932 (2d Cir.1998); *In re Maxwell Communication Corp.*, 93 F.3d 1036, 1047 (2d Cir.1996).

■ Comity is applied more broadly than the act of state doctrine. If the act of

state doctrine applies only to acts of a foreign state committed within its own territory, comity, on the other hand, can generally relate to extraterritorial effects of a foreign legal system. *Allied Bank Int'l,* 757 F.2d at 522. *But see Loucks v. Standard Oil Co.,* 224 N.Y. 99, 111, 120 N.E. 198 (1918) (stating that comity has been "fertile in suggesting a discretion unregulated by general principles").

■ Here, comity cannot be relied on as an alternative relief to the act of state doctrine because it is established law that comity is not applied in contravention of public policy principles. *See Allied,* 757 F.2d at 522; *see also Diorinou v. Mezitis,* 237 F.3d 133 (2d Cir.2001); *Finanz A.G. Zurich v. Banco Economico S.A.,* 192 F.3d 240 (2d Cir.1999); *Cunard S.S. Co. Ltd. v. Salen Reefer Services AB,* 773 F.2d 452 (2d Cir.1985). In the case at bar, expropriation of the property of an American company by an act of a foreign sovereign is unquestionably against the public policy of the United States.

### (4)

### The Berne Convention's Principle of National Treatment

Finally, defendants contend that this court's decision violated the Berne Convention's national treatment principle. They state that "[t]he 2003 Order is overtly premised on an impermissible discrimination in favor of a United States copyright claimant over a foreign copyright claimant." (Defendants' Memo of Law at 30). In support of their allegation, defendants refer to the following statement by this court:

If the High Arbitrazh Court's clearly erroneous decision impacted only the rights of Russian parties, this court might, nevertheless, defer to the High Court's arbitrary departure from what

appears to have been the consensus understanding of the leasing legislation. However, insofar as this ruling affects the rights of a non-Russian party ... the sudden shift in Russian law affected by the High Arbitrazh Court's decision, which operates to deprive an American corporation of its substantial investment, is simply unconscionable." (Defendants' Memo of Law at 30, citing *Films by Jove II,* 250 F.Supp.2d at 205).

Although the statement cited by the defendants is dictum, it does not contradict the Berne principle of national treatment. The principle of national treatment is embodied in Article 5(1) of the Berne Convention, stating that:

Authors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now and or may hereafter grant to their nationals, as well as the rights specifically granted by this Convention. Berne Convention for the Protection of Literary and Artistic Works, Sept. 9, 1886, 828 U.N.T.S. 221 (Paris revision, July 24, 1971), at art. 5(1).

■ The principle of national treatment is the basic principle of the Berne Convention and as such is unanimously followed by the United States courts. Under this principle, a foreign copyright owner is provided in the United States courts the same protection as a citizen owner. For a long time, the principle of national treatment has been treated as a choice of law provision dictating that both the issue of copyright infringement as well as copyright ownership should be determined by the law of the country of infringement. In the predominant number of cases, the country of infringement was also the country where the action for infringement was brought. *See* Edward J. Ellis, "National

Treatment under the Berne Convention and the Doctrine of Forum Non Conveniens," 36 IDEA 327, 331 (1996); Stephen M. Stewart, International Copyright and Neighboring Rights 37 (2d ed.1989). Indeed, under this approach, since FSUESMS chose to intervene in this action, this court should decide SMS's claims vis-a-vis FSUESMS, rather than leave these issues to the Russian courts.

In this context, this court's dictum was a simple statement that if plaintiff were not a United States citizen, the United States interests involved in this litigation would be that much weaker, and this court would have less significant conflict-of-laws reasons to critically examine the Russian legal process.

### Conclusion

The December 24, 2003 Directive is not controlling law in this case. It is also not within the scope of the act of state doctrine, because it constitutes a direct attempt to confiscate, without compensation, an American company's property rights in the United States. Because of its confiscatory nature, the December 24, 2003 Directive is also not entitled to any consideration under the doctrine of comity. Therefore, the defendants' motion is denied.

SO ORDERED.